## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| ROSALIE DEVONSHIRE, | ) | CASE NO.  3:02CV7223 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES. G. CARR |
| | ) | |
| v. | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT OF DEFENDANTS** |
| THE JOHNSTON GROUP FIRST | ) | |
| ADVISORS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Defendants, The Johnston Group First Advisors ("Johnston Group") and Bradley Johnston ("Johnston") (collectively "Defendants") respectfully move this Court, pursuant to Federal Rule of Civil Procedure 56, for summary judgment dismissing the Complaint of Plaintiff Rosalie Devonshire ("Devonshire") on the ground that no genuine issue of material fact exists to preclude judgment in Defendants' favor as a matter of law.

A brief and evidentiary materials in support of this motion are attached hereto and incorporated herein by reference.

/s/ Jonathan W. Philipp

JONATHAN W. PHILIPP (0043705)
BRIAN T. McELROY (0073930)
JANIK & DORMAN, L.L.P.
9200 South Hills Boulevard
Suite 300
Cleveland, Ohio  44147-3521
Phone: (440) 838-7600
Fax:    (440) 838-7601
Email: Jonathan.Philipp@Janiklaw.com
Email: Brian.McElroy@Janiklaw.com

Attorneys for Defendants Bradley Johnston
and The Johnston Group First Advisors

## TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………….….…………………….       iii


BRIEF IN SUPPORT OF DEFENDANTS'
      MOTION FOR SUMMARY JUDGMENT…………………………..       1

ISSUES PRESENTED…………………………………………………...…….       1

    I. SUMMARY OF ARGUMENTS PRESENTED……………....…       1

    II.  FACTS……………………………………………….……………       2

        A.  PARTIES……………………………………………….       2

        B.  PERFORMANCE OF THE DEVONSHIRE
            ACCOUNTS…………………………………….       3

        C.  THE DEVONSHIRE DIVORCE…………………………....       3

        D.  THE SEPTEMBER 29, 2000 MEETING…………….....…       4

        E.  FOLLOW-UP TO THE SEPTEMBER MEETING
            AND PRELUDE TO THE MARCH MEETING…….       6

        F.  PLAINTIFF'S DEPARTURE FROM
            THE JOHNSTON GROUP AND HER NEW
            ACCOUNT AT WILCOX FINANCIAL………..……       8

    III.  LAW AND ARGUMENT……………………………………...       10

        A.  NO TORT ACTION CAN LIE FOR AN
            ALLEGED BREACH OF CONTRACT…………….       10

        B.  DEFENDANTS DID NOT BREACH ANY
            CONTRACT THEY MAY HAVE HAD WITH
            DEVONSHIRE…………………………………       11

        C.  DEVONSHIRE'S ALLEGATION OF
            NEGLIGENCE IN REGARDS TO THE
            HANDLING OF HER INVESTMENTS
            FAILS AS A MATTER OF LAW…………………..       12

D.  DEVONSHIRE'S FRAUD CLAIM BASED
ON UNSUITABLE INVESTMENTS FAILS
AS A MATTER OF LAW………………………….           14

1.  DEVONSHIRE'S PORTFOLIO WAS
SUITABLE………………………………….           15

2.  DEFENDANTS BELIEVED DEVONSHIRE'S
PORTFOLIO WAS SUITABLE FOR HER,
FOR THE SIMPLE FACT THAT IT WAS..           16

3.  DEFENDANTS DID RECOMMEND
AND/OR PURCHASE SOME OF
DEVONSHIRE'S INVESTMENTS………           19

4.  DEFENDANTS DID NOT DEFRAUD
DEVONSHIRE AND DID NOT ACT
WITH SCIENTER…………………………           19

5.  AS DEFENDANTS NEVER TOLD OR
OTHERWISE IMPLIED TO DEVONSHIRE
THAT SHE HAD A CONSERVATIVE
ACCOUNT.  THEREFORE, SHE COULD
NOT HAVE JUSTIFIABLY RELIED
ON ANY SUCH STATEMENT…………..….           19

IV.  CONCLUSION…………………………………………....…           20

CERTIFICATE OF SERVICE.………………………………………           21

EXHIBITS

APPENDIX

TABLE OF AUTHORITIES

**Cases**

*Banca Cremi v. Alex Brown & Sons, Inc*., 132 F.3d 1017 (4th Cir. 1997) .............................. 13, 14

*Battista v. Lebanon Trotting Assn*., 538 F.2d 111 (6th Cir. 1976).......................................... 10, 11

*Brown v. E.F. Hutton & Group, Inc.*, 991 F.2d 1020 (2nd Cir. 1993) .................................... 13. 14

*Cassidy v. Azko Nobel Salt, Inc*., 308 F.3d 613 (6th Cir. 2002) .................................................. 10

*Chang's Holdings S.A. v. Universal Chemicals and Coatings*,
  1994 WL 681091 (Del.Ch. 1994) *unpublished* ......................................................................... 18

*Coleman & Company Securities, Inc. v. Giaquinto Family Trust*,
  236 F.Supp.2d 288 (S.D.N.Y. 2002) ........................................................................................ 13

*Craighead v. E.F. Hutton & Co., Inc.*, 899 F.2d 485 (6th Cir. 1990)......................... 13, 14, 15, 19

*Cremi v. Brown*, 955 F.Supp. 499 (D. Maryland 1997).................................................................. 13

*Dale v. Prudential-Bache Securities Inc.*, 719 F.Supp. 1164 (E.D.N.Y. 1989) ..................... 13, 14

*Doner v. Snapp*, 98 Ohio App.3d 597 (Ohio App. 2 Dist. 1994) .................................................. 12

*Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817 (1938).............................................................. 10

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375 (1976).............................................. 14

*Franks v. Cavanaugh*, 711 F.Supp. 1186 (S.D.N.Y. 1989) ......................................................... 13

*In re Comshare Inc. Securities Litigation*, 183 F.3d 542 (6th Cir. 1999)..................................... 15

*Ketcham v. Miller*, 104 Ohio St. 372, 136 N.E. 145 (1922) ......................................................... 10

*Newman v. L.F. Rothschild, Unterberg, Towbin*, 651 F.Supp. 160 (S.D.N.Y. 1986) ................. 19

*O'Conner v. R.F. Lafferty & Co., Inc.*, 965 F.2d 893 (10th cir. 1992).................................... 13, 14

*Oak Rubber Co. v. Bank One, N.A.*, 214 F.Supp.2d  820 (N.D. Ohio 2002). .............................. 10

*Ohio City Orthopedics, Inc. v. Medical Billing and Receivables*,
  2003 WL 1869873 (Ohio App. 8 Dist. 2003) *unpublished* ...................................................... 11

*Platsis v. E.F.Hutton & Co., Inc.*, 946 F.2d 38 (6th Cir. 1991) .............................................. 13, 14

*Randolph P. Schindler v. Charles A. Stockley and Gabriel Brokerage, Inc.*,

1985 WL 2338 (S.D.N.Y. 1985) *unpublished* ....................................................... 5, 17

*Rivera v. Clark Melvin Securities Corp.*, 59 F.Supp.2d 280 (D. Puerto Rico 1999) ............. 13, 14

*S.A. v. Alex Brown & Sons, Inc.*, 132 F.3d 1017 (4th Cir. 1997) .................................... 14

*Shafer v. P.S.I. Paper System, Inc.,* 61 Fed. Appx. 949,
2003 WL 1465416 (6th Cir. 2003) *unpublished* .......................................................... 12

*Textron Financial Corp. v. Nationwide Mutual Insurance Co.*,
115 Ohio App.3d 137 (Ohio App. 9 Dist. 1996) ............................................................. 10, 11

*The Salvation Army v. Blue Cross and Blue Shield of Northern Ohio*,
92 Ohio App.3d 571 (Ohio App. 8 Dist. 1993) ............................................................... 11

*Thomas v. Publishers Clearing House, Inc.*, 29 Fed. Appx. 319,
2002 WL 193935, 2* (6th Cir. 2002) *unpublished* ....................................................... 12

*Wolfe v. Continental Cas. Co.*, 647 F.2d 705 (6th Cir. 1981) ...................................... 10, 11

**Statutes**

1934 Securities Exchange Act ....................................................................................passim

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| ROSALIE DEVONSHIRE, | ) | CASE NO.  3:02CV7223 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES. G. CARR |
| | ) | |
| v. | ) | **BRIEF IN SUPPORT OF DEFENDANTS'** |
| | ) | **MOTION FOR SUMMARY JUDGMENT** |
| THE JOHNSTON GROUP FIRST | ) | |
| ADVISORS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ISSUES PRESENTED

1.)    Whether the Defendants breached any contractual duty they owed to Plaintiff, which breach resulted in damages?

2.)    Whether Plaintiff may maintain a claim against the Defendants for negligent investment advice?

3.)    Whether Plaintiff has established a claim for unsuitability pursuant to Federal Securities laws?

## I. SUMMARY OF ARGUMENT

In her Complaint, Rosalie Devonshire ("Devonshire") alleges breach of contract and negligence in the mishandling of her securities accounts.  Devonshire alleges that she was a conservative investor and told Bradley Johnston ("Johnston") and the Johnston Group First Advisors ("Johnston Group") (collectively "Defendants") that she only wanted to be in conservative investments.  As discovery has progressed, it has become apparent that nothing

1

could be further from the truth.  As an initial matter, neither claim is plead with the minimal amount of facts needed to survive even today's liberal pleading standards.  Devonshire alleges breach of contract then fails attach or reference a contract or even discuss the contractual provisions which Defendants have allegedly breached.  Moreover, Devonshire's cause of action for negligence in the mishandling of her accounts does not even exist under either Ohio or federal law.  At best, a liberal reading of Devonshire's Complaint could be construed to allege an unsuitability claim, which claim is based in fraud, not negligence.  As set forth herein, there is not a scintilla of evidence of fraud to support a claim for "unsuitability."

Devonshire, like many investors from the go-go '90's, got caught up in the tech bubble and now is simply trying to make her broker-dealer the "insurer" against the market bubble burst.  For the reasons set forth below, this Court should dismiss her Complaint in its entirety.

## II. FACTS

### A.     Parties.

In the mid-90's, Devonshire and her then husband, David Devonshire ("David") lived in Minnesota where David was employed as Controller at Honeywell Corporation.  Johnston had previously consulted with Honeywell officials on their retirement and stock option plans and later started his own firm, The Johnston Group, in 1992 or 1993.  (Johnston Depo. Pgs. 5 & 32; Appendix A).

In 1994, the Devonshires executed an Investment Advisor Agreement wherein they appointed Johnston as their Registered Investment Advisor, and opened up several brokerage accounts though Schwab Investments for Johnston to manage.  (Exhibit 1).

David maintained an individual account and the Devonshires maintained a joint account. (Devonshire Depo. Pg. 25; Appendix B).  In 1996, an individual Schwab account number 2827-3474 ("account 2827-3474") was set up in Devonshire's name, ostensibly for estate planning

purposes.  (Devonshire Depo. Pgs. 22-24; Johnston Depo. Pg. 11; Exhibit 2).  Accounts were also set up for the couple's two minor children.  (Devonshire Depo. Pg. 24).  However, no input for the handling of these accounts came from Devonshire.  Instead, these accounts were handled by David who was an expert in finance.[1] (Devonshire Depo. Pgs. 20-21 & 24).  The Devonshires' investment goals for all their accounts under Johnston's management were oriented toward capital appreciation.  (Johnston Depo. Pg. 12).  The Devonshires provided Johnston with no separate instructions, other than capital appreciation, for the handling of Devonshire's individual account.  (Johnston Depo. Pg. 11).

### B.    **Performance of the Devonshire Accounts**.

Between 1996 and 2000, the joint account enjoyed an average annual gain of +10.90%, with a gain of +61.83% in 1996 alone.  (Exhibit 3).

Under Johnston's management, Devonshire's individual account enjoyed an average annual gain between 1996 and 2000 of + 23.34%, with a gain of +51.26% in 1999.  (Exhibit 4). The accounts in the names of David and the Devonshire children enjoyed similar growth between 1996 and 2000.

### C.    **The Devonshire Divorce**.

On or around May, 1999, Devonshire filed for divorce from David.  Shortly after filing for divorce, Devonshire opened a brokerage account with Commerce Bank at a local New Jersey branch.  (Devonshire Depo. Pgs. 41-42; Exhibit 5).  Through this account and on the advice of her Commerce investment advisor, Joanna Jervis, Devonshire invested in two Alliance mutual funds, $70,000 in Alliance Premier Growth Fund, Class B and $30,000 in Alliance Technology Fund, Class B.  (Devonshire Depo. Pgs. 42-44).  These aggressive and therefore risky funds, did

---

[1] By 2000, David was a vice-president and the chief financial officer for Ingersoll-Rand, and is currently an Executive Vice-President and the Chief Financial Officer for Motorola.

reasonably well during the height of the technology bubble but came crashing back to earth when that bubble burst. (Devonshire Depo. Pg. 46; Exhibit 5 and 6)

On March 10, 2000, Devonshire wrote a note to Johnston, and attached it to her Commerce account statement. Devonshire explained she was transferring this account to Johnston for further management. (Exhibit 7). In the note, Devonshire specifically stated she wanted to keep the aggressive tech fund, but allowed Johnston to sell the growth fund (a moderately aggressive investment). (*Id.*). However, if Johnston did sell the growth fund, Devonshire directed Johnston to reinvest the proceeds in a bio-tech fund or individual companies (both more aggressive investments). (*Id.*).

In June, 2000, the terms of the property settlement were negotiated by Devonshire and David without the assistance or input of Devonshire's lawyers, accountants, or Johnston. (Devonshire Depo. Pg. 37-39). As part of this agreement, cash, specific equities and equity funds in David's account and the joint account were transferred to Devonshire's individual account. (Devonshire Depo. Pgs. 76-78). Devonshire selected the equities and equity funds without the input of Johnston. (Devonshire Depo. Pgs. 56-57).

### D.    The September 29, 2000 Meeting.

In the late Summer of 2000, with knowledge of Devonshire's impending divorce and at the request of David, Johnston suggested to Devonshire that they meet to discuss her investments in hopes of maintaining her as a client after the divorce was finalized. (Johnston Depo. Pgs. 14-15). As Johnston had almost exclusively dealt with David prior to the divorce he wanted to get to know Devonshire better "…and her situation, quantitatively, qualitatively, to be able to formulate an independent relationship from the historical relationship". (Johnston Depo. Pgs. 14-15).

On September 19, 2000, ten days prior to their meeting, Devonshire sent an e-mail to Johnston explaining that she will need money to buy a house and "will be needing some of the income from the portfolio to live on and some to keep invested."  (Exhibit 8).  In this e-mail, Devonshire also instructed Johnston to "make me some good money in the next few weeks."  (*Id.*).[2]

Johnston met Devonshire in a New Jersey hotel on September 29, 2000.  In advance of this meeting, Johnston requested that Devonshire prepare a budget of her income and expenses to bring to the meeting for him to review.  (Devonshire Depo. Pg. 60).  At the meeting, Devonshire presented Johnston with what she described as "my scribblings of my monthly budget."  (Devonshire Depo. Pg. 62; Exhibit 9).  In her budget, Devonshire listed her income as $150,000 in alimony for seven years (then $100,000 for the next three years), $25,000 in salary, $7,000 from her book sales and $100,000 from her and David's oil and gas wells (Johnston lowered this number to $75,000).  (Devonshire Depo. Pgs. 63-64; Exhibit 9).  Devonshire then estimated her monthly expenses to be almost $11,000 per month but included an extra $4,000 per month as a cushion.  By Devonshire's own calculations she did not need present income from her investments to meet her budget.  (*Id.*).

Johnston understood that the investment horizon (the time Devonshire would need to start taking withdrawals from her account) for Devonshire's accounts to be seven to ten years.  (Johnston Depo. Pg. 27).  In her deposition Devonshire agreed:

> I [have] enough income from my alimony and whatever to live on, as you can see from my little budget there, so the income from the investments would be—I wanted to use that for the house in Florida, for the mortgage payment and expenses there, and that the rest of the income from the

---

[2] It should be noted that "investor[s] who requested conservative, long term investments to increase their nest egg, can expect different trading activity than one who seeks aggressive, rapid trading to build up a quick profit."  *Randolph P. Schindler v. Charles A. Stockley and Gabriel Brokerage, Inc*., 1985 WL 2338 (S.D.N.Y. 1985) *unpublished* (Appendix D).  If Devonshire truly were a conservative investor, as she alleged, she would not have expected Johnston to earn her "good money in the next few weeks."

> investments would be reinvested…and that I wouldn't need to live off the
> income on the investments until my alimony was gone

(Devonshire Depo.  Pgs. 70-71).

At the meeting, Johnston gave Devonshire several forms that she needed to complete in order for him to move forward with managing her accounts after the divorce, including "an Investment Advisory Agreement, a Client Agreement, and a New Account Form to establish a very clear relationship and authorization for [him] to work on her behalf".  (Johnston Depo, Pg. 19-20; Exhibit 10). [3]  Devonshire requested to take the paperwork with her and agreed to send it to Johnston at a later date. (Johnston Depo. Pg. 29).  Devonshire NEVER signed or returned the new agreements.  (Devonshire Depo. Pgs. 69-70 and Johnston Depo. Pg. 28).

### E.      Follow-Up to the September Meeting and Prelude to the March Meeting.

Johnston placed at least two calls to Devonshire between the September 29th and January 26th, 2001 to inquire as to the status of the still outstanding paperwork in Devonshire's possession.  (Johnston's Depo. Pg. 27-28).  However, no paperwork was forthcoming.

Devonshire's Judgment for Divorce was entered on November 29, 2000.  (Exhibit 11).  However, it was not until early January that Johnston received final confirmation that all the required account transfers regarding the Devonshires' division of property, had taken place. (Johnston Depo. Pg. 51; Exhibit 12).

After the account transfers were finalized, Devonshire held $1,722.464.31 in her individual account compromising 47% individual equities, 31% equity funds, and 22% in cash and money markets. (Exhibit 13).  Devonshire also had an additional $440,000.00 cash in her Schwab IRA money market account and almost $80,000.00 cash in her Commerce and Norwest

---

[3] Exhibit 10 is a species copy of a Johnston Group investment advisor agreement for 2000.

Bank accounts.  (Exhibit 12).  Accordingly, Devonshire's portfolio contained a balance of 60% equities/equity funds and 40% fixed/cash.[4]

Because of his conversations with Devonshire, Johnston knew that she was going to be a busy woman after her divorce was finalized in November Devonshire was going to be with her family during the holidays, then in Florida on an extended vacation, then back to New Jersey to pack her things and move to Ohio where she then had to find a new job.  (Devonshire Depo. Pgs. 79-80).    Because of this, Devonshire did not want and Johnston did not send his proposed investment plan to her until after the first of the year.  On January 26, 2001, Johnston sent Devonshire a letter outlining his proposed investment strategy.  (Exhibit 14).  Even by this advanced date, Devonshire by her own admission had still not signed and returned the account forms Johnston had provided her in September.  (Devonshire Depo. Pgs. 69-70; Johnston Depo. Pg. 28).

In the investment strategy letter, Johnston recommended moderate growth in the range of 8-10% to "increase bond investment income and stock dividends to replace the income stream that will begin to decline in [2007] from alimony."  (Exhibit 14).  Johnston further recommended initially holding:

> 70% equity investments and 25% fixed rate bonds with 5% of the portfolio in short term cash instruments…The intention…[was] to move toward higher income producing and dividend paying shares in 2004-2006.  In 2007, we will have increased your bond investment income and stock dividends to replace [your alimony] income stream.

(Exhibit 14).  Johnston had prepared this letter in November, but at Devonshire's request, held off sending it until after the divorce was final.  (Johnston Depo. Pg. 29).  Devonshire did not call or contact Johnston after receipt of the January 26, 2001 letter with any comments, questions, or most importantly, any concerns.  (Devonshire Depo. Pgs. 90-92).

---

[4] These figures do not include the approximately $200,000.00 Devonshire had in equity in her newly purchased Florida home. (Devonshire Depo. Pgs. 10-11).

Devonshire and Johnston met in Minneapolis in early March 2001 to discuss her account performance.  (Devonshire Depo. Pg. 93).  At this meeting, Johnston delivered Devonshire's February statement for her individual account, showing an overall decrease in portfolio value of $297,911.86 and an ending balance of $1,504,148.64.  (her January statement showed an increase in portfolio value of $106,981.10).  (Devonshire Depo. Pg. 96; Exhibits 6 and 15).  Devonshire was "so upset" at the meeting from losing "so much money", she instructed Johnston for the first time, to "just sell something", but gave no indication of what or how much to sell.  (Devonshire Depo. Pgs. 96-97).  Moreover, Devonshire was admittedly unaware of the stock market conditions in late 2000, and early 2001.[5]  (Devonshire Depo. Pg. 96-97).  At the end of March, Devonshire's equity/equity fund to fixed/cash total portfolio balance was 59%/41%.  (Exhibit 17).

**F.      Plaintiff's Departure from the Johnston Group and Her New Account at Wilcox Financial.**

Devonshire transferred "management" of her accounts from the Johnston Group in late March 2001.  On April 3, 2001, she opened an account with Carillon Investments, Inc., Wilcox Financial ("Wilcox") (Devonshire Depo. Pg. 98).  Prior to opening her account, Devonshire responded to a Wilcox Investor Profile.  (Exhibit 18).  Devonshire agreed with several statements that shed significant light on her "true" investment objectives.  These include:

Investment Objectives

Which of the following best describes your investment objectives?

Preserving principal and earning a moderate amount of current income…1
Generating a high amount of current income……………………………..2
Generating some current income and growing my assets…………………3[6]
Growing my assets substantially…………………………………………..4

* * *

---

[5] The technology bubble burst causing the NASDAQ crash in late March, 2000, but the Dow Jones did not begin to make significant declines until February, 2001.  Both markets continued to decline through early 2003.  (Exhibit 16).
[6] The highlighted sections indicate Devonshire's answers to the questions.

Ten years from now, what do you expect your portfolio value to be?

The same as or a little more than it is today?..............................................1
Moderately greater than it is today?........................................................2
Substantially greater than it is today?......................................................3

What is your current income requirement (interest plus dividends) from this portfolio?

More than 4%...................................................................................1
2% to 4% ………………………………………………………………2
0% to 2%.........................................................................................3

* * *

Which of the following investments would you feel most comfortable owning?

Certificates of deposit………………………………………………..1
U.S. Government securities……………………………………………2
Stocks of older, established companies…………………………………3
Stocks of newer, growing companies…………………………………4

Based on Devonshire's responses, Wilcox proposed an investment plan which allocated 60% of the portfolio in equity holdings and 40% in fixed income holdings, virtually the exact same ratio of holdings she held when she left Defendants. (Exhibits 17). However, Devonshire expressly rejected the proposal, citing a desire for more equity holdings. (Ferris Depo. Pgs. 28-29; Appendix C). Devonshire told her new investment advisor, that this "moderate" investment plan did not grow at a rate that she found adequate. (Ferris Depo. Pgs. 28-29; Exhibit 18). Accordingly, Devonshire, instructed Ferris to increase her portfolio to 70% equities and 30% fixed income, the exact same investment plan recommended by Defendants. (Ferris Depo. Pgs. 28-29; Exhibits 18 and 19).

Subsequently, on March 29, 2002, Devonshire filed a Complaint against Johnston and the Johnston Group alleging that she was really a conservative investor and that they had invested too aggressively on her behalf. For the reasons set forth below, Defendants respectfully request that this Court grant their Motion for Summary Judgment.

### III.  LAW AND ARGUMENT

**A.**   **No Tort Action Can Lie for an Alleged Breach of Contract.**

Johnston alleges that Defendants breached their contract with her by failing to "…make appropriate investments, to follow her instructions…" and alleges negligence "…by failing to handle her investments properly, to follow her instructions…" Complaint ¶¶ 8 & 10.  In evaluating Devonshire's breach of contract claim this court must turn to Ohio contract law principles.  *Cassidy v. Azko Nobel Salt, Inc*., 308 F.3d 613, 615 (6th Cir. 2002)  ("Interpreting a non-ERISA contract claim requires federal courts to look only to state law principles, and has nothing to do with federal common law.") citing *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817 (1938).

As is apparent from her Complaint, Devonshire's contract claim and her negligence claim arise from the exact same allegations and as a matter of law, both can not proceed to trial. *Textron Financial Corp. v. Nationwide Mutual Insurance Co*., 115 Ohio App.3d 137, 151 (Ohio App. 9 Dist. 1996). ("generally the existence of a contract action…excludes the opportunity to present the same case as a tort claim."); *Oak Rubber Co. v. Bank One, N.A.*, 214 F.Supp.2d 820, 830 (N.D. Ohio 2002).

If there was a valid contract between Devonshire and Defendants and that contract was breached, there can be no tort action as a result of that breach.  *Wolfe v. Continental Cas. Co*., 647 F.2d 705, 710 (6th Cir. 1981) (under Ohio law a breach of contract does not create a tort claim.) *Battista v. Lebanon Trotting Assn*., 538 F.2d 111, 117 (6th Cir. 1976) ("it is not tort to breach a contract regardless of motive.  A tort exists only if the party breaches a duty which he owes to another independently of the contract…"); *Ketcham v. Miller*, 104 Ohio St. 372, 136 N.E. 145 (1922) ("[G]ravamen of the complaint is breach of contract and that the words

willfully, wantonly, maliciously add nothing thereto…"); *Ohio City Orthopedics, Inc. v. Medical Billing and Receivables*, 2003 WL 1869873, 4* (Ohio App. 8 Dist. 2003) *unpublished* (Appendix E) ("Finally, we note that it is well established in Ohio that it is not a tort to breach a contract."); *The Salvation Army v. Blue Cross and Blue Shield of Northern Ohio*, 92 Ohio App.3d 571, 578 (Ohio App. 8 Dist. 1993) ("It is not a tort to breach a contract…").

Not only is there no tort action for a breach of a contract, "generally the existence of a contract action…excludes the opportunity to present the same case as a tort claim." *Textron,* 115 Ohio App.3d at 151 *citing Wolfe v. Continental Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981). A separate action in tort may only exist, if "…the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed." *Id.*, *citing Battista*, 538 F.2d at 117.[7]

Therefore, if this Court finds that there is a valid contract between Defendants and Devonshire then it must dismiss her negligence action and if there is no contract, then Devonshire's breach of contract claim must be dismissed.

**B.    Defendants Did Not Breach Any Contract They May have had with Devonshire.**

Devonshire alleges that Defendants breached their contract with her by failing to follow her instructions.  As initial matter, Devonshire's Complaint fails to attach the alleged contract or contracts at issue or even to indicate which contractual provision(s) Defendants allegedly violated.

Because Devonshire failed to identify the contract or contractual provisions Defendants allegedly breached, Defendants are not in a position to properly defend against Devonshire's baseless allegations.  However, for purposes of this Motion for Summary Judgment, Defendants

---

[7] Devonshire has alleged no separate duties in her Complaint.

will assume that Devonshire was referring to the one individual account she maintained through Schwab for which Johnston was her registered representative.  (Exhibit 2).

"There are four main elements of a contract claim: (a) existence of a contract;[8] (b) performance by the plaintiff; (c) breach by the defendant; and (d) damage or loss to the plaintiff." *Thomas v. Publishers Clearing House, Inc.*, 29 Fed. Appx. 319, 2002 WL 193935 (6th Cir. 2002) *unpublished* (Appendix G) citing *Doner v. Snapp*, 98 Ohio App.3d 597 (Ohio App. 2 Dist. 1994).

In examining Devonshire's account agreement with Schwab, it is readily apparent that Defendants are not parties to the agreement, as the Schwab agreement contains no clauses that require Defendants to take any action on behalf of Devonshire.  (Exhibit 2).  Instead the agreement sets forth the relationship between Schwab and Devonshire, and Schwab and Johnston, but not a relationship between Johnston and Devonshire.  Indeed, Defendants were attempting to formalize their post-divorce relationship with Devonshire by giving Devonshire documents to sign to formalize this relationship, but she neglected to sign and return these documents. (Exhibit 10).

Accordingly, Devonshire's breach of contract claim fails and must be dismissed.

### C.     Devonshire's Allegation of Negligence in Regards to the Handling of her Investments Fails as a Matter of Law.

Devonshire pleads a negligence claim as to the handling of her investments.  With a liberal reading of her Complaint, one can infer that Devonshire was attempting to allege that the investments she had were unsuitable.  Unfortunately for Devonshire, there is no such thing as negligence cause of action for placing a customer in unsuitable investments.  Instead, such action

---

[8] "The necessary elements of a contract have been expressed in different ways, but it is clear in Ohio a contract requires (1) an offer and acceptance (i.e. meeting of the minds); (2) on a lawful subject matter; and (3) sufficient consideration." *Shafer v. P.S.I. Paper System, Inc.*, 61 Fed. Appx. 949, 2003 WL 1465416, 2* (6th Cir. 2003) *unpublished*, (Appendix F).

is based in fraud. *Platsis v. E.F.Hutton & Co., Inc.*, 946 F.2d 38, 42 (6th Cir. 1991) ("Unsuitability claims are essentially fraud claims which must be plead with particularity"); *quoting Craighead v. E. F. Hutton & Co., Inc.*, 899 F.2d 485, 493-94 (6th Cir. 1990); *Banca Cremi v. Alex Brown & Sons, Inc*., 132 F.3d 1017, 1032 (4th Cir. 1997) (recognizing that a claim for unsuitability exists under § 10(b)); *Brown v. E.F. Hutton & Group, Inc.*, 991 F.2d 1020, 1030-31 (2nd Cir. 1993) (affirming that the Second Circuit recognizes a claim for unsuitability under § 10(b)); *O'Conner v. R.F. Lafferty & Co., Inc.*, 965 F.2d 893, 898 (10th cir. 1992) (allowing a cause of action for unsuitability under § 10(b) and adopting the Second Circuit's test for unsuitability but adding the element of control); *Coleman & Company Securities, Inc. v. Giaquinto Family Trust*, 236 F.Supp.2d 288, 303 fn.10 (S.D.N.Y. 2002) ("unsuitability [claims], which under federal law may only be pled as a violation of federal antifraud provisions"); *Rivera v. Clark Melvin Securities Corp*., 59 F.Supp.2d 280, 291 (D. Puerto Rico 1999) (the necessary elements of a unsuitability claim are similar to those of a churning claim and must plead intent to defraud or reckless disregard); *Cremi v. Brown*, 955 F.Supp. 499, 517-18 (D.Maryland 1997) ("analytically, an unsuitability claim is a subset of the ordinary § 10(b) fraud claim"); *Dale v. Prudential-Bache Securities Inc*., 719 F.Supp. 1164, 1172 (E.D.N.Y. 1989) (plaintiffs claims for unsuitability must comply with Civil Rule 9(b) and specify which securities where unsuitable); *Franks v. Cavanaugh*, 711 F.Supp. 1186, 1189-90 (S.D.N.Y. 1989) (plaintiff must identify the allegedly unsuitable securities and give at least some indication why they were unsuitable in order to comply with Civil Rule 9(b)).

"Unsuitability cannot be shown by negligence alone..." *Coleman & Company*, 236 F.Supp.2d at 303. Though a cause of action exists for allegations of unsuitability, the Sixth Circuit has recognized that such an action must be plead in fraud, under section 10b of the 1934 Securities Exchange Act ("The 1934 Act") and Securities Exchange Commission ("SEC")

Rule10b-5.  *Craighead*, 899 F.2d at 493.  Because unsuitability claims are fraud claims, they

must be plead with the particularity required by Civil Rule 9(b).  *Platsis*, 946 F.2d at 42; *Dale,*

F.Supp. at 1172; *Rivera*, 59 F.Supp.2d at 291.

### D.  Devonshire's Fraud Claim Based on Unsuitable Investments Fails as a Matter of Law.

Even if Devonshire properly plead a Section 10(b) (Rule 106-5) claim, it should be

dismissed on summary judgment.  In *Craighead v. E.F. Hutton & Company*, 899 F.2d 485 (6th

Cir. 1990) the Sixth Circuit held that claims under Rule 10b-5 are "essentially fraud claims

which must be plead in particularity…" *Id*. at 493.  This requires the naming of the securities and

transactions at issue and why they were inappropriate.  *Id. See also, Platsis v. E.F. Hutton & Co.,*

*Inc*., 946 F.2d 38, 42 (6th Cir. 1991).

A Section 10(b) unsuitability claim has five elements.  They are:

1)  that the securities purchased were unsuited to the buyer's needs;

2)  that the defendant knew or reasonably believed the securities were unsuited to the buyer's needs;

3)  that the defendant recommended or purchased the unsuitable securities for the buyer anyway;

4)  that, with scienter, the defendant made material misrepresentations (or, owing a duty to the buyer, failed to disclose material information) relating to the suitability of the securities; and

5)  that the buyer justifiably relied to its detriment on the defendant's fraudulent conduct.

*Banca Cremi, S.A. v. Alex Brown & Sons, Inc*., 132 F.3d 1017, 1032 (4th Cir. 1997); *Brown v.*

*E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1031 (2nd Cir. 1993).[9]  Scienter is defined as a "mental

state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425

---

[9] Some Circuits use a similar, but the more difficult to prove churning test as their test for unsuitability.  The test is: 1) a plaintiff must plead that the broker recommended or purchased securities unsuitable in light of the investor's objectives, 2) had an intent to defraud or a reckless disregard for the investor's interests, and 3) exercised control over the investor's account.  *O'Conner v. R.F. Lafferty & Co., Inc*., 965 F.2d 893, 898 (10th Cir. 1992)

U.S. 185, 193, 96 S.Ct. 1375 (1976). The Sixth Circuit has determined that proving recklessness will satisfy scienter element of a Rule10b-5 claim. *In re Comshare Inc. Securities Litigation*, 183 F.3d 542, 552-53 (6th Cir. 1999).

      1.    <u>Devonshire's Portfolio was Suitable.</u>

The most remarkable thing about Devonshire's unsuitability claim is that she is unable to prove four and a half of the five elements required by *Craighead*.[10] Devonshire's total investments, on the balance, were suitable for her and designed to meet her stated short and long term goals. Frankly, Devonshire filed her Complaint because she is upset that the market tanked and wants someone to cover her loses.

Examining the first element, whether the securities purchased were suitable for Devonshire, presents a dilemma, because Devonshire never alleged which individual securities were improper. Instead, Devonshire simply alleges her entire portfolio was improper because it was not "conservative." However, at no time did Devonshire express to Johnston a desire for conservative investments. Moreover, there is not a single document that shows Devonshire to be a conservative investor. Instead, the documents produced in discovery indicate that Devonshire was an aggressive investor. (Exhibits 5, 7, 8, 18 and 19). Most importantly, Devonshire had two separate opportunities to document to Johnston that she was a conservative investor. In the first instance Devonshire only had to return the New Account and New Client Forms to Defendants which Johnston gave her on September 29, 2000. Instead, Devonshire failed to do this and Johnston had to rely on Devonshire's past actions and statements in the management of her accounts.

The second instance is after Devonshire received Johnston's proposed investment plan for her on January 26, 2001. (Exhibit 13). If this plan was too aggressive for Devonshire, she

---

[10] Defendants do not contest that they recommended and/or purchased some but not all of Devonshire's investments.

only had to pick up the telephone or send an email to Johnston and tell him.  Devonshire did not do this.

Accordingly, the facts are undisputed that Devonshire's investments were suitable for her and her stated goals and consistent with her documented conduct.  The Complaint should be dismissed.

    2.    <u>Defendants Believed Devonshire's Portfolio was Suitable for her, for the Simple Fact that it was</u>.

The second element is whether Johnston reasonably believed the securities were unsuitable for Devonshire. One only need remember old adage that actions speak louder than words to see that her claims are baseless.  Unlike the allegations in her Complaint, Devonshire did at several times give specific guidance (and specific directions) to Defendants in regards to her investments, and her guidance was decidedly un-conservative.[11]

Initially, in 1996 Devonshire listed three investment objectives in declining order of importance; (1) growth and income, (2) tax advantages, and (3) growth.  She did NOT even rank the income only bracket.  (Exhibit 2).  Devonshire never formally altered this investment objective.  Instead, Devonshire confirmed her aggressive investing style through Joanna Jervis at Commerce Bank.  (Exhibit 4).  In July 1999, Devonshire invested $70,000 in Alliance Premier Growth Fund Inc, Class B and $30,000 in Alliance Technology Fund, Class B.  Later, at the urging of her husband, Devonshire transferred these funds to Defendants.  At this time she allowed Johnston to sell the Growth fund, but not the tech fund.  Moreover, if the Growth fund was sold, she wanted the profits used to purchase a bio-tech fund or individual stocks.  Devonshire's instructions to Johnston were clear:  You may sell my one moderately aggressive investment (the growth fund), but if you do, I want you to buy an extremely aggressive fund to

---

[11] After initial filing for divorce, Devonshire gave no specific instructions to Johnston in the handling of her individual or the joint accounts, except to alert her attorney of any account withdraws by David.

replace it. Moreover, I do not want you to balance my portfolio because I still want to keep my tech fund. This action is not the "conservative" investments Devonshire alleged she wanted in her Complaint. Her directive is the antithesis of a conservative investor and the hallmark of an aggressive investor.

Devonshire's next instructions were more informative. In an email to Johnston on September 19, 2000 she wrote: "make me some good money in the next couple of weeks." No "conservative" investor, as Devonshire now claims to be, dreams of, let alone seeks, to earn large profits in a short time frame. *See Randolph P. Schindler, 1985 WL 2338, at 4* ("investor[s] who requested conservative, long-term investments to increase their nest egg can expect different trading activity than one who seeks aggressive, rapid trading to build up a quick profit").

During their September 29, 2000 meeting, Johnston learned of Devonshire's income needs and investment goals and was, therefore, able to design an investment plan for her. Devonshire determined that she has income of approximately $257,000.00 a year through alimony and other sources, and has slightly less than $140,000.00 a year in expenses (not including taxes). (Exhibit 9). Devonshire's notes also indicate she would be receiving $150,000 in alimony for the next seven years and then $100,000 a year for the next three years. Based upon her own representations, Devonshire did not have an immediate need for income, but instead needed her account to grow in value, until her alimony payments began to run out when she would then need to begin to make withdrawals from her investments.

Based on Devonshire's representations during the September 29, 2000 meeting, Johnston began to prepare her investment strategy, which plan he mailed to her on January 26, 2001. Though he tried to make arrangements to see her earlier and discuss his proposed plan, Devonshire kept putting off meeting with Johnston until early March 2001. Johnston's plan was well balanced and designed to meet not only Devonshire's short term but also her long term

17

goals, a mark of a prudent investor.  *Chang's Holdings S.A. v. Universal Chemicals and Coatings*, 1994 WL 681091, 4* (Del.Ch. 1994) *unpublished* (Appendix H) ("The prudent investor employs a long term and a short term investment strategy even through the investor's overall approach is conservative.")

Johnston, recommended a moderate growth strategy of earnings of 8-10% a year.[12]  Using Devonshire's own admissions that she did not need income to live off of for several years after her divorce, Johnston advised Devonshire to have her portfolio initially in 70% equity, 25% bond and 5% cash.  Later, as Devonshire neared the time when her alimony payments where to be lowered, her bond investment and investments in dividend producing stocks would be increased.[13]  Defendants proposed investment strategy for Devonshire could not have been better suited for her and if anything, their advice was more conservative than all of her previous instructions to them had been.

As if Devonshire's actions had not clearly shown her aggressive investing style, her true colors shined when she switched to her new investment advisor, Ferris.  Less than a month after leaving Defendants and three months after receiving Defendants' investment plan for her, Devonshire answered an investor questionnaire.  (Exhibit 18).  This questionnaire measured her investment objectives, risk tolerance and investing horizon, and her responses indicated that a portfolio balance of 60% equities, 40% fixed was appropriate.  However, Devonshire rejected this balance because it would not provide the gains she wanted.  Instead, she specifically requested that the equity balance be increased to 70%.  (Ferris Depo. Pg. 28-29; Exhibit 18).

---

[12] U.S. Bonds average approximately 4-5% returns between 1802 and 1995.  In contrast, and because of they are higher risk than bonds, U.S. stocks averaged 7.79% between 1802 and 1995 but have averaged 12.42% between 1950 to 1995.  www.fool.com/school/basics/investingbasics008.htm

[13] Companies can only pay dividends if they have extra cash after all expenses are paid.  Therefore, dividends tend only to be paid by larger, well established companies.

Clearly, Devonshire, has failed to show that Defendants knew that their investment plan for her was unsuitable.

3.     <u>Defendants did Recommend and/or Purchase some of Devonshire's Investments</u>.

As to the third element of the unsuitability test, it is abundantly clear that three of the funds and seven of the stocks in Devonshire's account were neither purchased nor recommended by Defendants for her individual accounts.  Clearly, the two Alliance mutual funds purchased by Devonshire through Commerce Bank and later transferred to Defendants were neither recommended or purchased by Defendants and must be excluded from any liability claim.  As to the seven stocks and one fund Devonshire received as a result of her divorce, several facts must be noted.  First, the stocks and the fund were purchased by Defendants as part of a balanced <u>marital</u> portfolio for the Devonshires collectively, not for either individually.  More importantly, these stocks and funds were <u>not</u> chosen by Defendants to be transferred into Devonshire's account. Instead Devonshire and her husband determined which stocks and funds where to be transferred upon divorce without any outside input.    (Devonshire Depo. Pgs. 57-58).  Accordingly, any claims as to these equities must be dismissed as they fail to meet this third element.

4.     <u>Defendants did not Defraud Devonshire and did not act with Scienter</u>.

Devonshire has failed to prove the first three elements of her unsuitability claim.  The fourth element, intent to defraud (scienter), is not even plead in the Complaint.  As such, her Complaint fails and must be dismissed.  *Craighead*, 899 F.2d at 493-94.

5.     <u>As Defendants Never Told or Otherwise Implied to Devonshire that She had a Conservative Account.  Therefore, She Could not have Justifiably Relied on any such Statement</u>.

This last element, like the first four, is simply not plead by Devonshire.  This fact alone is fatal to her Complaint.  *Newman v. L.F. Rothschild, Unterberg, Towbin*, 651 F.Supp. 160, 163

(S.D.N.Y. 1986) (Though failure to plead scienter is by itself fatal to plaintiff's claim, plaintiff also fails to plead reliance on the alleged misstatements).  However, it should be noted that Defendants never told Devonshire she had a conservative account, as her Complaint alleges she wanted.  In fact, Devonshire received monthly account statements which illustrated to her exactly what investments she owned at any given time. (Exhibit 13). Moreover, Johnston specifically described Devonshire's investment balance to her in his January 26, 2001 letter by stating "[t]he overall allocation is **presently** focused on an alignment of 70% equity investments...25% fixed rate bonds…5% short term cash."  (Exhibit 14) (emphasis added).

Clearly, Devonshire was told the truth about her portfolio balance and was never told she had a conservative account (she had a moderate growth account), a fact she must have been told and relied on to succeed in her unsuitability claim.  Therefore, for this reason her Complaint fails and should be dismissed.

## IV.    <u>CONCLUSION</u>

Therefore, for the reasons set forth above, Devonshire's Breach of Contract and unsuitability claims both fail as a matter of law and should be dismissed.

Respectfully submitted,

/s/ Jonathan W. Philipp
JONATHAN W. PHILIPP (0043705)
BRIAN T. McELROY (0073930)
JANIK & DORMAN, L.L.P.
9200 South Hills Boulevard, Suite 300
Cleveland, Ohio  44147-3521
Phone: (440) 838-7600
Fax:    (440) 838-7601
Email: Jonathan.Philipp@Janiklaw.com
Email: Brian.McElroy@Janiklaw.com

Attorneys for Defendants Bradley Johnston
and The Johnston Group First Advisors

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on  the 9th day of October, 2003, a copy of the foregoing *Motion for Summary Judgment of Defendants and Supporting Brief* were filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Jonathan W. Philipp
JONATHAN W. PHILIPP (0043705)
JANIK & DORMAN, L.L.P.

One of the Attorneys for Defendants Bradley
Johnston and The Johnston Group First Advisors

2-1673\MSJ0001b.82

2-1673/MSJ0001b.82 (BTM)